UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

**09 CIV 6813**

Plaintiff,

v.

Civil Action No.

KENNETH SELTERMAN AND PATTI TAY,

Defendants.

## COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows against defendants Kenneth Selterman and Patti Tay:

### SUMMARY OF ALLEGATIONS

1.  Defendants Kenneth Selterman ("Selterman") and Patti Tay ("Tay"), the former General Counsel and former Controller/Chief Accounting Officer, respectively, of video game publisher and distributor Take-Two Interactive Software, Inc. ("Take-Two" or the "Company"), enriched themselves and others by knowingly or recklessly allowing Ryan Brant ("Brant"), Take-Two's former Chairman/Chief Executive Officer, to backdate the Company's stock option grants. The scheme involved granting backdated, undisclosed "in-the-money" stock options that coincided with dates of historically low annual and quarterly closing prices for Take-Two's common stock. The closing price of the Company's common stock on those days was used as the exercise price of the options that were granted.

2.  Defendants Tay and Selterman knew, or were reckless in not knowing, that exercise prices for stock options had been picked with hindsight and each of them created Company

records that falsely indicated that grants had occurred on earlier dates when the Company's stock

price had been at a low. Tay's misconduct with respect to stock option backdating occurred

from at least as early as 1998, while Selterman's misconduct occurred from at least as early as

2002.

3. On over 100 occasions between April 1997 and at least September 2003, Take-Two

granted backdated stock options to senior officers, members of the Board of Directors and to key

employees without complying with its own stock option plans and, generally, without the Board

or a committee thereof approving the grant dates and exercise prices. Selterman and Tay each

received stock options that had been backdated. Tay received and exercised backdated stock

options representing at least 120,000 shares of stock on a split-adjusted basis, thereby obtaining

several hundred thousand dollars in illicit compensation. Selterman received and exercised

backdated stock options representing at least 215,500 shares of stock on a split-adjusted basis,

and obtained several hundred thousand dollars in illicit compensation.

4. Contrary to Generally Accepted Accounting Principles ("GAAP"), Take-Two did not

record or disclose the compensation expenses it incurred as a result of the "in-the-money"

portions of the option grants. Both Selterman and Tay knew that granting stock options at

exercise prices less than fair market value on the date of the grant required the Company to

record a charge to earnings.

5. Take-Two filed with the Commission and disseminated to investors current reports on

Form 8-K, quarterly and annual reports, and proxy statements. By virtue of the undisclosed stock

option backdating scheme, the defendants knew, or were reckless in not knowing, that these

filings materially understated Take-Two's compensation expenses and materially overstated its

quarterly and annual pretax earnings and earnings per share (or understated its losses), and

contained materially false and misleading statements pertaining to the true grant dates and the proper exercise prices of options, which created the false and misleading impression that the Company granted options in accordance with the terms of the stock option plans.

6.    Take-Two has restated its historical financial results from 1997 through 2005 in order to record additional non-cash charges for option-related compensation expenses totaling $42.1 million after tax. By failing to record compensation charges for the "in-the-money" portion of the backdated grants between 1997 and at least 2003, Take-Two materially overstated its net income by 13.2% for 1999, 807.4% for 2000, 19.9% for 2002, 10.7% for 2003, 5.2% for 2004 and 5.4% for 2005. The Company also materially understated its losses by 57.5% for 2001.

7.    By virtue of the conduct alleged in this Complaint, Tay and Selterman directly and indirectly engaged in, and unless restrained and enjoined by the Court will continue to engage in, acts, transactions, practices and courses of business that violate Sections 10(b), 13(b)(5), and 16(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b), 78m(b)(5), and 78p(a)], and Exchange Act Rules 10b-5, 13b2-1, 13b2-2, and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2, and 240.16a-3]. Tay and Selterman also aided and abetted Take-Two's violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a)], and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.14a-9].

8.    The Commission seeks judgment from the Court:  (a) enjoining Tay and Selterman from engaging in future violations of the sections of the federal securities laws they violated; (b) requiring Selterman to disgorge, with prejudgment interest, ill-gotten gains derived from his violations; (c) requiring Tay and Selterman to pay civil monetary penalties pursuant to Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and (d) permanently barring Tay and

Selterman from acting as officers or directors of a public company pursuant to Section 21(d)(2)

of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## JURISDICTION AND VENUE

9.   The Court has jurisdiction of this civil enforcement action pursuant to Sections 21(d),

21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78(u)(e) and 78aa].  Tay and Selterman

made use of the means or instruments of interstate commerce, of the mails, or of the facilities of

a national securities exchange in connection with the acts, transactions, practices and courses of

business alleged in this Complaint.

10.  Venue lies in the Southern District of New York pursuant to Section 27 of the

Exchange Act [15 U.S.C. § 78aa].  Take-Two published false and misleading quarterly and

annual reports, and proxy statements, which were prepared in and transmitted from this District.

## THE PARTIES

11.  The plaintiff is the Securities and Exchange Commission, which brings this civil

enforcement action pursuant to the authority conferred on it by Sections 21(d) and 21(e) of the

Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

12.  Defendant Tay, 38, lives in Brooklyn, New York.  From 1998 until 2002, Tay served

as Controller of Take-Two, and served as Chief Accounting Officer beginning in 2002.  On

November 10, 2006, Tay resigned from Take-Two.  She is a Certified Public Accountant

licensed in the state of New York.

13. Defendant Selterman, 59, lives in Chappaqua, New York. Selterman, an attorney licensed in the state of New York, joined Take-Two as General Counsel in 1999 where he worked until his resignation on February 28, 2007.

## RELATED PARTIES

14. Take-Two is a Delaware corporation headquartered in New York, New York that operates in the United States, Canada, Europe, and other foreign locations. The Company develops, markets, publishes and distributes interactive entertainment software games for video game consoles and personal computers. Take-Two also publishes through its wholly-owned labels Rockstar Games, 2K Games, 2K Sports and 2K Play. Prior to July 31, 2006, Take-Two registered its common stock with the Commission pursuant to Section 12(g) of the Exchange Act and traded on the NASDAQ NMS under the symbol "TTWO." Since July 31, 2006, Take-Two has registered its common stock with the Commission pursuant to Section 12(b) of the Exchange Act and has traded on the NASDAQ Global Market under the same symbol. The Company operates on an October 31 fiscal year.

15. On June 13, 2005, this Court entered a Final Judgment by consent permanently enjoining Take-Two from violating the antifraud, reporting, record-keeping, and internal controls provisions of the federal securities laws, and ordered the Company to pay disgorgement and a civil penalty, in connection with an alleged fraudulent revenue recognition scheme. SEC v. Take-Two Interactive Software, Inc., et al., Civil Action No. 05-CV-5443 (S.D.N.Y. June 13, 2005) [Litigation Release No. 19260].

16. On April 3, 2009, this Court entered a Final Judgment by consent permanently enjoining Take-Two from violating the antifraud, reporting, record-keeping, and internal controls provisions of the federal securities laws, and ordered the Company to pay a civil penalty, in

connection with the alleged options backdating scheme. SEC v. Take-Two Interactive Software, Inc., Civil Action No. 09-CV-03113 (S.D.N.Y. Apr. 3, 2009) [Litigation Release No. 20982].

17. Brant, age 37, lives in New York, New York. He founded Take-Two in 1993 and was the Chief Executive Officer and Chairman of the Board until February 2001, when he resigned as CEO. He resigned from the Chairmanship in March 2004. While CEO and/or Chairman, Brant reviewed and/or signed periodic reports, registration statements, and proxy statements filed with the Commission and disseminated to investors. In March 2004, he assumed the non-executive position of Director of Software Publishing at a Take-Two subsidiary, and then assumed the non-executive position of Vice President of Production at Take-Two until his resignation from the Company on October 16, 2006. He is currently employed at video game publishing label Zoo Games, Inc. in New York, New York in the non-executive position of Content Acquisition Director.

18. On February 16, 2007, this Court entered a Final Judgment permanently enjoining Brant from violating the antifraud provisions, and from aiding and abetting violations of the reporting, record-keeping and internal controls provisions of the federal securities laws in connection with his alleged role in the Company's options backdating scheme. The Court ordered Brant to pay disgorgement, prejudgment interest and a civil penalty, and prohibited him from serving as an officer or director of any issuer having a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]. SEC v. Ryan Ashley Brant, Civil Action No. 07-CV-1075 (S.D.N.Y. Feb. 16, 2007) [Litigation Release No. 20003].

19. On June 13, 2005, this Court entered a Final Judgment by consent permanently enjoining Brant from violating and/or aiding and abetting violations of the antifraud, reporting,

record-keeping, and internal controls provisions of the federal securities laws; barred him from serving as an officer or director of any public company for five years; and ordered him to pay disgorgement, prejudgment interest, and a civil penalty in connection with his alleged role in a fraudulent revenue recognition scheme at Take-Two. SEC v. Take-Two Interactive Software, Inc., et al., Civil Action No. 05-CV-5443 (S.D.N.Y. June 13, 2005) [Litigation Release No. 19260].

## FACTS

### A.    Background

20.  Take-Two used employee stock options as a form of compensation.  Each option gave the grantee the right to buy one share of Take-Two common stock from the Company at a set price, called the "exercise" or "strike" price, on a future date after the option vested.  The option was "in-the-money" whenever the trading price of Take-Two's common stock exceeded the option's exercise price.  The option was "at-the-money" whenever the trading price of Take-Two's common stock and the exercise price were the same.  The option was "underwater" or "out-of-the-money" whenever the trading price of Take-Two's common stock was less than the exercise price.

21.  Throughout the relevant time period, Take-Two accounted for stock options using the intrinsic method described in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25").  Under APB 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date."  The measurement date, as defined by APB 25, is the first date on which the following information is known:  (i) the number of options that an individual employee is entitled to receive and (ii) the exercise price.  An option that is "in-the-money" on the

measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are "at-the-money" or "out-of-the-money" on the measurement date need not be expensed.

**B.      Take-Two's Option Plans And Disclosures**

22.  Between 1997 and at least September 2003, Take-Two made, purportedly pursuant to the Company's 1997 Stock Option Plan (the "1997 Plan") and its 2002 Stock Option Plan (the "2002 Plan"), grants of stock options to officers, directors, and Company employees including key personnel. Take-Two adopted the 1997 Plan on January 31, 1997 – prior to its initial public offering – by the unanimous written consent of its board of directors. The 1997 Plan was approved and ratified by Brant, who was the holder of a majority of the shares of common stock. In April 1998 – after the Company went public – a majority of the shareholders voted to amend the 1997 Plan.

23.  The 1997 Plan required that a committee of two board members administer the granting of stock options and vested the committee with the authority to decide grant dates, the number of options to be granted, the individuals who would receive the options, and to determine other terms and conditions "not inconsistent with the requirements of this Plan." The 1997 Plan directed that the exercise price, duration, and vesting schedule of options "be determined by the Committee." The 1997 Plan did not expressly permit the committee to delegate these powers, but granted it "full authority to interpret this Plan." The 1997 Plan prohibited Take-Two from granting incentive stock options with exercise prices of less than the stock's fair market value on the date of grant.

24. Under the 2002 Plan, approved by Take-Two's shareholders on June 14, 2002, the option grants were to be administered by the board or a committee of at least two members of the board. The 2002 Plan provided that the exercise price for a grant "shall be determined by the Board . . . or the Committee." The 2002 Plan prohibited Take-Two from granting options with exercise prices of less than the fair market value on the grant date.

25. In its Forms 10-K for fiscal years 1997 and 1998, Take-Two disclosed that it "applies APB No. 25 . . . and related interpretations in accounting for its plans. Accordingly, no compensation cost has been recognized for the stock option plans." In its Forms 10-K for fiscal years 1999 through 2003, the Company disclosed that it applies APB No. 25 and the financial statements reflected that the Company had not recognized compensation cost for the stock option plans.

## C.    The Backdating Scheme

26. Between April 1997 and at least September 2003, Take-Two disregarded and contravened the provisions of the 1997 Plan and the 2002 Plan in granting stock options. Take-Two routinely granted options without the Board or a committee thereof approving the grant dates and exercise prices. During this period, Brant looked back at Take-Two's historical stock prices and, with the benefit of hindsight, chose grant dates that coincided with the dates of low closing prices for the stock, resulting in "in-the-money" options.

27. Take-Two then falsely recorded in its books and records that option grants occurred on dates when the Company's stock traded at a price below its actual market price – often at a low for the quarter or the year. There was no contemporaneous documentation evidencing that these dates were selected on the purported grant dates. Indeed, no corporate action to approve the grants occurred on the backdated dates and the grants were not final on those dates.

28. Since as early as 1998, Tay knew, or was reckless in not knowing, that Brant was using hindsight to select stock option grant dates and that the Company was not accounting properly for stock options. She also prepared documents falsely indicating that option grants had been made on earlier dates when Take-Two's stock price had closed lower. Specifically, between 1998 and at least April 2002, Tay prepared and maintained (and thereafter until at least September 2003, was involved in maintaining) the Company's Master Options List, a record that reflected information relating to stock option grants. The list was an Excel spreadsheet into which Tay, or one of her subordinates, entered option grant information (such as the purported grant date and exercise price) that Brant had provided to her. Tay knew, or was reckless in not knowing, that the option grant information Brant provided was false. As a result, the Master Options List reflected artificial grant dates which resulted in the exercise price matching the date treated as the grant date so as to avoid taking the required compensation expense or charge in Take-Two's financial statements.

29. Tay knew that there were accounting and financial statement consequences when the exercise price of stock options was a price other than the fair market value of the stock on the date that the grant was actually approved. In spite of this, Tay consciously ignored the accounting consequences of using false stock option grant dates while assisting in the preparation of Take-Two's financial statements.

30. Tay knew, or was reckless in not knowing, that Take-Two's filings with the Commission did not disclose that the Company was granting "in-the-money" options. Tay also knew, or was reckless in not knowing, that Take-Two's filings with the Commission falsely represented that the Company was properly accounting for stock option grants, and that because

of the backdating, Take-Two's financial statements falsely reported materially higher net income (or materially lower losses).

31. Tay received and exercised backdated "in-the-money" options representing at least 120,000 shares of stock on a split-adjusted basis, thereby obtaining several hundred thousand dollars in illicit compensation. In August 2007, Tay made a cash payment to the Company in satisfaction of her improper "in-the-money" gain from exercising backdated stock options.

32. Selterman, who joined Take-Two in 1999 as its general counsel, was, in part, responsible for ensuring that the options granting process complied with Take-Two's own stock option plans, including the Company's 2002 Plan that he helped create and draft. As Selterman knew, the Company's stock option plans (1) required that either the Company's Board or a committee thereof determine the exercise price for options grants and (2) expressly prohibited Take-Two from granting stock options (which under the 1997 Plan were limited to incentive stock options) with exercise prices of less than the stock's fair market value on the date of the grant. Beginning in 2002, and continuing through the end of 2003, Selterman also was responsible for ensuring that the actions taken by the Board or Compensation Committee to grant and approve stock options were properly documented in the Company's books and records. In this regard, Selterman during this time prepared, or supervised the preparation of, Board or Compensation Committee minutes for stock option grants.

33. From at least as early as 2000, Selterman knew, or was reckless in not knowing, that stock option grants were being backdated. For example, Selterman received and read an e-mail from Tay on October 23, 2000 in which she wrote, "[f]or [a new director's] options, there are various price fluc[tuations] this quarter from around $9 to $15. Around when was [director's] options discussed. The lowest price is 8/7/00 at 9.125." Selterman's only response was

11

"Sometime in October." This grant was backdated. Also, on August 30, 2000, when Take-Two's stock was trading around $14 per share, Brant e-mailed Selterman to offer him 50,000 options at a price of $9.93 per share, which was the closing price of Take-Two stock on July 31, 2000. Selterman forwarded the August 30 e-mail to Tay on September 26, 2000. On September 28, Tay sent the e-mail to Brant, copying Selterman, and asked Brant whether he meant to price the options for Selterman at July 31 or August 1, 2000.

34. In addition, from at least as early as January 2002, Selterman knew the accounting consequences of granting stock options at below fair market value. For example, in an e-mail Selterman wrote to senior management (including Tay) in January 2002 he stated, in relevant part, that "options must be granted at an exercise price equal to 100% of the fair market value of the underlying common stock on the date of the grant. Any below market issuance will result in a charge to earnings on the date of the grant."

35. On at least seven occasions after January 2002, Selterman knew, or was reckless in not knowing, that Take-Two granted stock options that were backdated to when the Company's stock traded at its lowest prices for the quarter or the year and, therefore, the Company should have taken an accounting charge. These grants, for which no accounting charges were, in fact, taken, purportedly occurred on the following dates: (1) February 22, 2002; (2) June 21, 2002; (3) June 24, 2002; (4) August 5, 2002; (5) September 26, 2002; (6) January 30, 2003 and (7) May 1, 2003. Selterman received options from at least three of these backdated grants: (1) February 22, 2002; (2) June 21, 2002 and (3) May 1, 2003.

36. The option grants purportedly made on February 22, 2002 are illustrative of the backdating scheme. The Company purportedly made a grant on February 22, 2002 of 511,000 options to fifteen employees or directors, including an award of 100,000 options to Brant. On

that day, the stock price closed at $15.25 per share, which was the lowest price of the fiscal quarter and of the calendar year. The grant could not have been made on February 22 because the Company did not have sufficient shares available under the 1997 Plan to make awards until April 2002. Brant selected the date for the grant, and Take-Two actually made the grant, in or around mid-April 2002, when the stock was trading at more than $20.00 per share. According to Brant, in April, when shares became available, he looked back and selected February 22 as the grant date because the stock price on that day was the lowest of the year.

37. Tay knew, or was reckless in not knowing, that Brant backdated this grant because in April 2002, this grant was entered into the Master Options List that Tay maintained based on information Brant provided at that time. Selterman knew, or was reckless in not knowing, that Brant had backdated this grant because in or around April 2002, Selterman, at Brant's direction, drafted minutes for a purported February 19, 2002 Compensation Committee meeting approving a grant of 100,000 options to Brant. On February 19, 2002, Take-Two's stock price closed at $17.01 per share. Selterman did not otherwise prepare any Compensation Committee meeting minutes for Brant's purported February 22, 2002 grant of 100,000 options. Minutes Selterman prepared for an April 25, 2002 meeting of Take-Two's Board of Directors purported to ratify certain option grants dated February 22, 2002, as set forth in an attached exhibit to the minutes. However, the attached exhibit: a) does not contain grant information for each of the fifteen individuals who received the purported February 22 options; and b) bears a date of June 25, 2002, two months after the Board meeting took place.

38. On numerous occasions prior to 2002, no Compensation Committee minutes for stock option grants were prepared. In the instances before and beginning in 2002 when Selterman prepared such minutes, he knew, or was reckless in not knowing, that Brant was using hindsight

to pick grant dates, yet, without inquiry, he simply recorded in the minutes what Brant told him about the granting and approval of option grants.

39. Selterman received and exercised backdated "in-the-money" options representing at least 215,500 shares of stock on a split-adjusted basis, thereby obtaining several hundred thousand dollars in illicit compensation.

**D. The Defendants Knew Or Were Reckless In Not Knowing That Take-Two Made Materially False And Misleading Filings With The Commission**

40. Take-Two filed with the Commission annual reports on Forms 10-K and 10-K/A for the fiscal years ended 1997 through 2005, which included financial statements that were audited by Take-Two's independent accountants.

41. In its annual reports from 1997 to 2003, Take-Two stated that the Company accounted for its employee stock option plans in accordance with APB 25. As discussed above, under APB 25, employers are required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." However, in its financial statements, which were included or incorporated by reference in the Company's filings, Take-Two consistently failed to record compensation expenses for backdated, "in-the-money" grants, falsely asserting that the reason it recognized no compensation expense for its options grants was that it granted all options at exercise prices equal to its stock's fair market value on the date of the grant, in accordance with APB 25.

42. Take-Two's financial statements were materially false or misleading through at least 2005. By failing to record compensation charges for the "in-the-money" portion of the option grants between 1997 and at least 2003, Take-Two materially overstated its net income by 13.2% for 1999, 807.4% for 2000, 19.9% for 2002, 10.7% for 2003, 5.2% for 2004, and 5.4% for 2005.

14

The Company also materially understated its losses by 57.5% for 2001. On February 28, 2007, Take-Two restated its historical financial results from 1997 to 2005 to record $42.1 million after tax in additional non-cash charges for compensation expenses related to the backdated "in-the-money" stock option grants.

43. Defendants Tay and Selterman, by virtue of their conduct, knew, or were reckless in not knowing, that Take-Two filed materially false and misleading annual reports and financial statements with the Commission. Tay generally reviewed the annual reports and assisted in the preparation of the financial statements that were included in the annual reports filed with the Commission. Tay also signed Take-Two's fiscal year 2001 Form 10-K filed with the Commission on February 12, 2002. Selterman reviewed portions of Take-Two's annual reports and knew that the Company made disclosures therein regarding compensation and/or options grants. Because of their conduct, Take-Two not only violated the express terms of its own Stock Option Plans, but Take-Two's annual reports also created the false impression that its stock options were granted "at-the-money," and its financial statements materially overstated its net income (or materially understated losses). As a result, Take-Two's annual reports filed with the Commission contained materially false and misleading disclosures and financial statements concerning its option grants.

44. Take-Two also filed with the Commission quarterly reports on Forms 10-Q and 10-Q/A between September 15, 1997 and September 8, 2005. The quarterly reports contained financial statements and disclosures concerning Take-Two's stock option grants that were materially false or misleading. Defendants Tay and Selterman generally reviewed portions of these quarterly reports and knew that the Company made disclosures therein regarding compensation and/or options grants. Tay assisted in preparing the financial statements for these

filings. By virtue of their conduct, the defendants knew, or were reckless in not knowing, that these quarterly reports were materially false and misleading.

45. In addition, Take-Two filed with the Commission between 1997 and 2005 current reports on Form 8-K, which announced the Company's financial results for the prior quarter. These current reports contained materially false and misleading financial information. Defendants Tay and Selterman generally reviewed these current reports and knew that the Company made disclosures therein regarding compensation and/or options grants. By virtue of their conduct, the defendants knew, or were reckless in not knowing, that Take-Two's current reports were materially false and misleading.

46. Take-Two's proxy statements (sent to shareholders and filed with the Commission between April 1998 and May 2005) also made materially false or misleading representations about Take-Two's stock option grants. Specifically, Take-Two's proxy statements contained repeated false statements as to the grant date price of options awarded to its top executives as well as other false and misleading statements, creating the false impression that the pricing provisions of the Company's stock option plans were being followed. By virtue of the defendants' conduct, Take-Two routinely granted stock options at less than fair market value through backdating in violation of its own Stock Option Plans. Tay knowingly or recklessly provided materially false and misleading information in the proxies regarding the grant date and prices of the options. Selterman assisted in drafting the executive compensation portions of the proxies, which he knew, or was reckless in not knowing, were materially false and misleading due to the backdating scheme.

47. As a result of the conduct of defendants Tay and Selterman, Take-Two's books and records falsely and inaccurately reflected, among other things, the dates of option grants, the

Company's stock-based compensation expenses, and the Company's financial condition. Additionally, as a result of Tay and Selterman's conduct, Take-Two failed to maintain a system of internal accounting controls sufficient to provide assurances that stock option grants were recorded as necessary to permit the proper preparation of financial statements in conformity with GAAP.

48.  Take-Two's auditors received copies of the Board or Compensation Committee minutes for stock option grants, and the Master Options List.

49.  During the relevant time period, Tay and Selterman failed to timely file all required Commission Forms 3 and 4 disclosing their option-related activity.

## FIRST CLAIM

### Violations of Exchange Act Section 10(b) and Exchange Act Rule 10b-5
### (Tay and Selterman)

50.  The Commission realleges paragraphs 1 through 49.

51.  Tay and Selterman, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or of the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

52.  By reason of the foregoing, defendants Tay and Selterman, and each of them, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Violations of Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1
### (Tay and Selterman)

53. The Commission realleges paragraphs 1 through 52.

54. Tay and Selterman, directly or indirectly, knowingly circumvented or knowingly

failed to implement a system of internal accounting controls at Take-Two, knowingly falsified

books, records and accounts at the Company subject to Section 13(b)(2)(A) of the Exchange Act

[15 U.S.C. § 78m(b)(2)(A)] and caused to be falsified, such books, records and accounts.

55. By reason of the foregoing, defendants Tay and Selterman, and each of them, directly

or indirectly, violated, and unless restrained and enjoined will continue to violate, Section

13(b)(5) of the Exchange Act and Exchange Act Rule 13b2-1 [15 U.S.C. § 78m(b)(5);

17 C.F.R. § 240.13b2-1].

## THIRD CLAIM

### Violations of Exchange Act Rule 13b2-2
### (Tay and Selterman)

56. The Commission realleges paragraphs 1 through 55.

57. Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2], in relevant part, makes it

unlawful for an officer or director of an issuer to, directly or indirectly:  (1) make or cause to be

made a materially false or misleading statement to an accountant in connection with any audit,

review or examination of financial statements, or the preparation or filing of any document or

report required to be filed with the Commission; or (2) omit to state, or cause another person to

omit or state, any material fact necessary in order to make statements made, in light of the

circumstances under which they were made, not misleading, to an accountant in connection with:

18

(i) any audit, review or examination of the financial statements of the issuer, or (ii) the preparation or filing of any document or report required to be filed with the Commission.

58. By reason of the foregoing, defendants Tay and Selterman, and each of them, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## FOURTH CLAIM

### Violations of Exchange Act Section 16(a) and Exchange Act Rule 16a-3
### (Tay and Selterman)

59. The Commission realleges paragraphs 1 through 58.

60. Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Exchange Act Rule 16a-3 [17 C.F.R. 240.16a-3] require officers, directors and beneficial owners of more than ten percent of any class of equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file periodic reports disclosing any change of beneficial ownership in those securities.

61. Tay and Selterman failed to timely file with the Commission the required Forms 3 and 4 to disclose their exercise of options or subsequent sales of stock.

62. By reason of the foregoing, defendants Tay and Selterman, and each of them, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 16(a) of the Exchange Act and Exchange Act Rule 16a-3 [15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3].

## FIFTH CLAIM

### Aiding and Abetting Take-Two's Violations of Exchange Act Section 14(a)
### and Exchange Act Rule 14a-9
### (Tay and Selterman)

63. The Commission realleges paragraphs 1 through 62.

64. Take-Two, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or of the facility of a national securities exchange, knowingly, recklessly or negligently solicited proxies by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or which omitted to state material facts which were necessary in order to make the statements made not false or misleading or which were necessary to correct statements in earlier false or misleading communications with respect to the solicitation of proxies for the same meeting or subject matter, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 [15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9]. Tay and Selterman knowingly or recklessly gave substantial assistance to Take-Two in its violations of Section 14(a) of the Exchange Act and Rule 14a-9 [15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9].

65. By reason of the foregoing, defendants Tay and Selterman, and each of them, directly or indirectly, aided and abetted, and unless restrained and enjoined will continue to aid and abet Take-Two's violations of Section 14(a) of the Exchange Act and Exchange Act Rule 14a-9 [15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9].

## SIXTH CLAIM

### Aiding and Abetting the Filing of False and Misleading Periodic Reports (Tay and Selterman)

66. The Commission realleges paragraphs 1 through 65.

67. Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Exchange Act Rules 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.13a-1, 240.13a-11 and 240.13a-13], require issuers of registered securities to file with the Commission factually accurate annual, current and

20

quarterly reports. Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made not misleading.

68. Take-Two filed with the Commission and disseminated to investors false and misleading annual, current and quarterly reports in violation of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [15 U.S.C. § 78m(a); 17 C.F.R. §§ 12b-20, 240.13a-1, 240.13a-11 and 240.13a-13]. Tay and Selterman knowingly or recklessly gave substantial assistance to Take-Two in its violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [15 U.S.C. § 78m(a); 17 C.F.R. §§ 12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

69. By reason of the foregoing, defendants Tay and Selterman, and each of them, directly or indirectly, aided and abetted, and unless restrained and enjoined will continue to aid and abet Take-Two's violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [15 U.S.C. § 78m(a); 17 C.F.R. §§ 12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

## SEVENTH CLAIM

### Aiding and Abetting Take-Two's Failure to Maintain Accurate Books and Records and Sufficient Internal Controls (Tay and Selterman)

70. The Commission realleges paragraphs 1 through 69.

71. Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets. Section 13(b)(2)(B) of the Exchange Act

[15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

72. By reason of the foregoing, Take-Two violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]. Tay and Selterman knowingly or recklessly gave substantial assistance to Take-Two in its failure to make and keep accurate books, records and accounts and its failure to devise and maintain a sufficient system of internal accounting controls.

73. By reason of the foregoing, defendants Tay and Selterman, and each of them, directly or indirectly, aided and abetted, and unless restrained and enjoined will continue to aid and abet Take-Two's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Permanently enjoin Tay and Selterman from violating Sections 10(b), 13(b)(5), and 16(a) of the Exchange Act and Exchange Act Rules 10b-5, 13b2-1, 13b2-2, and 16a-3, and aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9;

## II.

Order Selterman to disgorge all ill-gotten gains by virtue of the conduct alleged herein, and to pay prejudgment interest thereon;

## III.

Order Tay and Selterman to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

Permanently bar Tay and Selterman from serving as officers or directors of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## V.

Grant such equitable relief as may be appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act.

Dated:  Washington, DC
       July 31, 2009

Richard E. Simpson (NY BAR #2375814)
Christopher R. Conte
Ivonia K. Slade
Carol E. Schultze
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC  20549-4030
E-Mail:  simpsonr@sec.gov
Phone:    (202) 551-4492 (Simpson)
Fax:        (202) 772-9246